**John Lavert JOHNSON, Jr., Appellant,**

v.

**STATE of Texas, Appellee.**

**No. 11-92-020-CR.**

Court of Appeals of Texas, Eastland.

Nov. 12, 1992.

Rehearing Denied Dec. 10, 1992.

Bill Wischkaemper, Wischkaemper & Martinez, Lubbock, for appellant.

Nelda Williams, Appellate Section, Crim. Dist. Attys. Office, James Eidson, Crim. Dist. Atty., Taylor County Courthouse, Abilene, for appellee.

DICKENSON, Justice.

The jury convicted John Lavert Johnson, Jr., of the misdemeanor offense of "driving while intoxicated."[1] At appellant's election, the trial judge assessed his punishment at confinement in the county jail for 60 days and a fine of $1,000. We affirm the conviction.

### Points of Error

There is no challenge to the sufficiency of the evidence. Appellant presents two points of error, arguing: (point one) that the trial court erred in admitting the audio portion of a videotape in which appellant invoked his right to counsel; and (point two) that his conviction is void because the regular judge was replaced by a "special judge" who is not shown to have been properly appointed and qualified.

### Background Facts

Appellant was arrested at 3:30 a.m. on December 22, 1990, by Officer Terrell Lynn

---

1. TEX.REV.CIV.STAT.ANN. art. 6701*l*-1 (Vernon Supp.1992) defines the offense and provides that the punishment for a second DWI offense shall be confinement for not less than 15 days nor more than 2 years and a fine of not less than $300 nor more than $2,000.

Perkins, Jr., of the Abilene Police Department. Officer Perkins observed appellant driving in an unsafe manner, and appellant did not do well on the field sobriety tests. Officer Perkins testified that appellant's speech was extremely slurred; that his eyes were bloodshot; that he got out of his car with difficulty; and that he had a strong smell of alcohol on him. Officer Perkins said that he arrested appellant for DWI, read him his rights, and took him to the Taylor County Detention Center. Officer Perkins testified that, in his opinion, appellant was legally intoxicated and that he did not have the normal use of his faculties. Officer Perkins escorted appellant to the "breathalyzer building" and read him the statutory form which warned him of the consequences of refusing to take the breathalyzer test. Appellant refused to sign the form, and he also refused to take the test. Officer Perkins then took appellant into the video room, told him that he was being recorded, and asked him to look at the camera. At that time, Officer Perkins again read appellant his rights and asked him if he wanted to call an attorney.

The videotape was played for the jury during Officer Perkins' testimony after the trial court judge made the following comments to the jury:

> We have previously, for the benefit of the Jury, we previously made a ruling on this tape. I am going to allow the tape and the *audio* up until the point that he talks to his lawyer. That portion of the tape will only be viewed for the *video, not the audio*. (Emphasis added)

After the 13–minute tape was shown to the jury, the trial court judge made the following statement:

> The record will reflect that the audio portion of the video[tape] was silent during the time the defendant was on the telephone.

After the videotape was played for the jury, appellant's attorney cross-examined Officer Perkins. Relevant portions of that testimony are:

> Q: Anyway, did you-all have any words on the way to the PD [police department]?

A: To the jail?

Q: Yes.

A: As I recollect—Oh, he did, okay, he did on the scene, when I was trying to arrest him, he wanted a lawyer at that moment. He didn't want to go. He wanted a lawyer to be called out to the arrest scene at that specific time and place. As I gathered, he wanted me to get permission from his lawyer before I placed him under arrest, is what I basically gathered. Yes, I do remember us having words, as far as that went. I handcuffed him and put him in the car, and I inventoried his vehicle, and when I came back, I read him his rights and asked him if he understood his rights, and at that point, he refused to answer, he didn't say anything.

Q: Was he agitated on the way to the jail?

A: I suppose he was, and that might have been why he didn't answer whether or not he understood his rights.

> *      *      *      *      *      *

Q: And did he want to call a lawyer?

A: I don't remember exactly what he said. He talked for awhile, and I showed him where the phone was. When he began talking, he was very belligerent and argumentative. It was kind of hard to figure out exactly what he wanted. I think once I gave him the opportunity or told him he could call a lawyer if he wanted, he kind of had to decide for awhile whether or not he wanted to. Finally he decided he did want one, and I showed him where the phone was. It is the same phone as you-all seen on the video there, he used the same phone book there and he called three different attorneys, but they either weren't answering their phone or they weren't home.

> *      *      *      *      *      *

Q: Well, we went over your offense report yesterday, and—

A: If you would like for me to explain my testimony, to clear that up, the man was impaired from the time I arrested him to the time I put him into the jail. *He looked good on the video.* The video

doesn't show a whole lot. It shows him being belligerent, and angry, and part of his hostile attitude, but as far as what he appeared to me to be like during those sobriety tests, and when I asked him to get out of the car, and that sort of thing, no, the video didn't show that. My testimony is, when I was getting him out of the car and doing the sobriety tests, this man was impaired. There was no doubt in my mind he didn't need to be behind the wheel. During the video, I still believed him to be impaired. He wasn't cooperating with me at all, and I still believed him to be impaired at that time. There is no doubt in my mind that he was impaired during the video. After the video, there is no question that he was impaired and under the influence of alcohol.

Q: Was he worse after the video?

A: He was extremely worse after the video. (Emphasis added)

The second witness was Officer Teresa Ann Jackson of the Abilene Police Department. She assisted in the arrest. She arrived while Officer Perkins was giving appellant the field sobriety tests, and she confirmed that Officer Perkins gave the tests correctly. She could smell alcohol on appellant, and she said that he was talking with a "bit of a slur." She also was of the opinion that appellant was intoxicated. She said that Officer Perkins is not hot tempered and that he is a lot more patient than some of the other officers. She waited at the scene until the tow truck came to get appellant's car. On redirect examination, she said that appellant said at the scene, before his arrest, that: "[H]e just had a few drinks with a couple of girls."

The third witness was Betty Atkins, a booking officer at the Taylor County Detention Center. It was about 7:00 a.m. when she came into contact with appellant, and she said that he was "very arrogant" and that he had "a very strong smell of alcohol." It was her opinion that he was still intoxicated at that time.

The fourth witness was Ray King, a corrections officer at the Taylor County Detention Center, who came into contact with appellant on the night of his arrest. Officer King said that appellant had a disheveled look and that he was kind of swaying. Officer King said that he could smell alcohol on appellant, that his speech was slightly slurred, and that appellant was "doing a lot of cussing" in a voice that was "raised above the normal voice." Officer King was of the opinion that appellant was intoxicated. Officer King took appellant to the "violent cell" because appellant refused to cooperate, and Officer King did not want anyone to get hurt.

The fifth witness was Officer Chris Smith of the Abilene Police Department. He was the breath test operator who was on duty at the time of appellant's arrest. He expressed the opinion that appellant was intoxicated at the time he saw him that night. Appellant was "unsure on his feet," "wouldn't talk to me," had redness around his eyes, had "a very strong odor of alcohol on his breath," and had a "real belligerent attitude." Officer Smith also testified that appellant "wasn't as belligerent on the video tape as he was in the intoxilyzer room."

The sixth witness was Deputy Sheriff Jeffery Dale Miller. He was the jail supervisor on the night of appellant's arrest. He watched appellant on the monitors from the control room and formed the opinion that appellant was intoxicated.

The final witness was David Wakefield, a corrections officer at the Taylor County Detention Center. Officer Wakefield said that he was in the control room, that he could see on the video monitor that appellant was giving a "little bit of trouble to the officer," and that he could "hear him cussing and causing a lot of trouble in booking." Officer Wakefield said that appellant was acting "pretty aggressive." When appellant refused to cooperate on the strip search, they called for assistance and moved him to the "violent cell."

### Claim that Conviction is Void

First, we will consider the point of error in which appellant argues that his conviction is void because:

[T]he record fails to show that the regular judge of County Court at Law Num-

ber One of Taylor County was disqualified, absent, or disabled to try this case, that the special judge was properly appointed, and that the special judge took the oath of office.

The record shows that Jess Holloway presided during the trial of this case. Judge Holloway was the regularly elected and qualified County Judge of Taylor County at the time this case was tried,[2] and Jack Grant was the regularly elected and qualified judge of the Taylor County Court at Law No. 1. In Taylor County, the judge of the county court and the judges of the two county courts at law exchange benches and sit for each other as the need arises. TEX. GOV'T CODE ANN. § 74.121 (Vernon Supp.1992) authorizes such an exchange of benches; however, this section specifically provides:

A judge may not sit or act in a case unless it is within the jurisdiction of his court.

The County Court of Taylor County does not have criminal jurisdiction; however, neither appellant nor the State objected to Judge Holloway presiding over this case. In fact, appellant elected to have Judge Holloway assess the punishment. We hold that any objection to Judge Holloway's sitting in this case should have been urged in a timely manner. See TEX.R.APP.P. 52(a). The second point of error is overruled.[3]

### The Videotape

■ Appellant argues in his remaining point of error that the trial court erred in permitting the jury to hear that portion of the videotape in which appellant exercised his constitutionally protected right to the advice of counsel. This court held in *Jones v. State,* 703 S.W.2d 391 at 393 (Tex.App.— Eastland 1986), *vacated* at 742 S.W.2d 398 (Tex.Cr.App.1987), *reversed* at 795 S.W.2d 171 (Tex.Cr.App.1990):

[T]he jury should not have been permitted to hear appellant claim the constitutional right to consult with her attorney.

While the Court of Criminal Appeals did not agree with our holding in *Jones v. State,* supra, that court has now announced a similar rule. See *Hardie v. State,* 807 S.W.2d 319 at 322 (Tex.Cr.App.1991):

We believe that evidence of an accused invoking his or her right to counsel may indeed be construed adversely to a defendant and may improperly be considered as an inference of guilt.

\*    \*    \*    \*    \*    \*

We therefore hold that evidence of one's invocation of the right to counsel is inadmissible as evidence of guilt.

The opinion in *Hardie* also approves a "harmless error" analysis under TEX. R.APP.P. 81(b)(2) consistent with *Harris v. State,* 790 S.W.2d 568 (Tex.Cr.App.1989). We sustain the first point of error, holding that the trial court erred in allowing the jury to hear appellant claim his right to consult with counsel; however, this does not automatically require reversal. We will proceed to analyze the error pursuant to *Harris v. State,* supra.

### *"Harmless Error" Analysis*

The Court of Criminal Appeals instructed the intermediate courts of appeal in *Harris v. State,* supra at 587, that we should not focus our attention on the outcome but that we should be concerned with the "integrity of the process" which resulted in the conviction and appeal. *Harris* instructs us that we should:

[E]xamine the source of the error, the nature of the error, whether or to what extent it was emphasized by the State, and its probable collateral implications. Further, the court should consider how much weight a juror would probably place upon the error. In addition, the Court must also determine whether declaring the error harmless would encourage the State to repeat it with impunity. In summary, the reviewing court should focus not on the weight of the other evidence of guilt, but rather on whether

---

**2.** At the present time, Judge Holloway is the 350th Judicial District Court Judge of Taylor County.

**3.** Judge Holloway was not a "special judge" within the meaning of the authorities cited by appellant.

the error at issue might possibly have prejudiced the jurors' decision-making; it should ask not whether the jury reached the correct result, but rather whether the jurors were able properly to apply law to facts in order to reach a verdict. Consequently, the reviewing court must focus upon the process and not on the result. In other words, a reviewing court must always examine whether the trial was an essentially fair one. If the error was of a magnitude that it disrupted the jurors' orderly evaluation of the evidence, no matter how overwhelming it might have been, then the conviction is tainted. Again, it is the effect of the error and not the other evidence that must dictate the reviewing court's judgment.

The opinion in *Harris* then tells us to: "[F]irst, isolate the error and all its effects ... and second, ask whether a rational trier of fact might have reached a different result" if the error had not occurred. *Harris* also makes it clear that "overwhelming evidence" is a factor which may be considered.

As shown by the "background facts" discussed above, the evidence of appellant's guilt was overwhelming and unchallenged. The source of the error was the Court of Criminal Appeals' holding in *Jones v. State*, supra.[4] There is no indication that the trial court or the State will fail to observe the law as it has now been declared in *Hardie v. State*, supra. The error was not emphasized by the State. Appellant's counsel went into the matter in detail during the cross-examination of the arresting officer and even proved that appellant had requested the right to counsel at the scene of the arrest and during the observation period prior to the offer of an intoxilyzer test. It is clear that, not only did the jury reach the correct result, the jury was able to properly apply the law to the facts in finding appellant guilty. Appellant received a fair trial, and we find that the conviction was not tainted by allowing the jury to hear the audio portion of the videotape in which appellant claimed his constitutional right to seek the advice of counsel. That

error did not disrupt the jurors' orderly evaluation of the evidence. We have determined beyond a reasonable doubt that the error made no contribution to the jury's finding of guilt, and we will presume that the trial court judge disregarded the error when he assessed the punishment. *Kimithi v. State*, 546 S.W.2d 323 at 327 (Tex.Cr. App.1977).

The judgment of the trial court is affirmed.

---

**4.** The trial court carefully followed the existing law as declared by the Court of Criminal Ap-

peals in *Jones v. State*, supra.